40 A.3d 734 (2012)
425 N.J. Super. 228
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Respondent,
v.
D.S.H., Defendant-Appellant, and
W.W., Defendant.
In the Matter of the Guardianship of R.S.H., Minor-Respondent.
Docket No. A-5723-10T1
Superior Court of New Jersey, Appellate Division.
Telephonically Argued March 20, 2012.
Decided April 12, 2012.
*735 Beatrix W. Shear, Deputy Public Defender, argued the cause for appellant D.S.H. (Joseph E. Krakora, Public Defender, attorney; Rhonda J. Panken, Designated Counsel, on the briefs).
Maureen Bull, Deputy Attorney General, argued the cause for respondent New Jersey Division of Youth and Family Services (Jeffrey S. Chiesa, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Ms. Bull, on the brief).
Hector Ruiz, Designated Counsel, argued the cause for minor respondent R.S.H. (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Mr. Ruiz, on the brief).
Before Judges GRAVES, KOBLITZ and HAAS.
The opinion of the court was delivered by
KOBLITZ, J.A.D.
D.S.H. appeals the June 16, 2011 order terminating her parental rights. In doing so, she raises a question of first impression concerning the nature of legal *736 fatherhood in the context of a termination of parental rights case.
D.S.H. is married to R.H. They have a child, Rachel,[1] who was born during the marriage. Six years after Rachel's birth, a paternity test indicated that R.H. is not Rachel's biological father. D.S.H. asks us to determine as a matter of law that R.H. is Rachel's legal father.
We agree with D.S.H. that, under these circumstances, R.H. remains the legal father of Rachel. It is therefore not necessary, and would be contrary to Rachel's best interests, to permanently sever her bond with her mother for the sole purpose of allowing R.H. to adopt her.
D.S.H. and R.H. were married at the time Rachel was born in March 2004. R.H. was named as Rachel's father on her birth certificate. R.H. left the marital home in early 2005 and obtained a restraining order against D.S.H. because of her violence toward him.
The Division of Youth and Family Services (Division) first became involved with the family on May 17, 2006, when R.H. reported that D.S.H.'s home, where Rachel was living, had "deteriorated" and "smell[ed] of urine and feces," and that there were "clothes all over." R.H. stated he did not "want his child to live like that." The Division conducted an investigation and found the home to be disheveled. D.S.H. refused any assistance from the Division.
On August 31, 2006, the Division received a referral alleging that D.S.H. was using crack and was on the brink of eviction. During this investigation, D.S.H.'s behavior was reported as erratic and "frantic." At some point, she started "crying, panting and breathing hard." The home was still in disarray. D.S.H. denied using crack at the time, but admitted to using it in the past. The Division received four additional referrals alleging substance abuse.
On April 5, 2008, the Division received a referral alleging that D.S.H. attempted suicide by cutting both wrists while four-year-old Rachel was in the home. D.S.H. arrived at East Orange General Hospital Crisis Unit agitated and with superficial cuts on both wrists. She tested positive for cocaine. As a result of this incident, the Division removed Rachel from the home and placed her with R.H. See N.J.S.A. 9:6-8.29 and .30.
On April 7, 2008, D.S.H. told the Division that R.H. was not Rachel's biological father. Two days later, D.S.H. tested positive for cocaine and was referred to St. Michael's Medical Center for intensive outpatient treatment. She tested positive for cocaine again one month later. The Division subsequently referred D.S.H. for further substance abuse treatment.
On November 3, 2008, the Division received another referral. A social worker informed the Division that D.S.H. was thirty-three weeks pregnant and had tested positive for cocaine at least three times during the pregnancy.
D.S.H. gave birth to Catherine in November 2008. Both D.S.H. and Catherine tested positive for cocaine at Catherine's birth. Catherine was removed from D.S.H.'s care and placed with her biological father upon the baby's release from the hospital. He was awarded sole physical and legal custody of Catherine by order dated January 20, 2010. The Division did not at any time seek to terminate D.S.H.'s parental rights to Catherine.
On November 18, 2009, the Division presented a permanency plan for termination of D.S.H.'s parental rights and reunification *737 of Rachel with her putative biological father, W.W. The judge rejected the plan, citing the Division's failure to locate W.W. and the absence of a paternity test indicating he is Rachel's biological father.
D.S.H. was allowed supervised visitation with Rachel at a supervised visitation program. Most of the visits were positive, but the program terminated visitation on July 28, 2010, after D.S.H. missed three consecutive visits.
In August 2010, Dr. Peter DeNigris, the Division's expert psychologist, conducted a psychological evaluation of D.S.H. and a bonding evaluation between her and Rachel. He also conducted a bonding evaluation between R.H. and Rachel.
Dr. DeNigris opined that D.S.H.'s history of poor judgment, her arrest record, the suspension of her home health aide certification and five-year period of unemployment, as well as a failure to plan for Rachel's future combined to negatively affect her ability to parent. Dr. DeNigris further found D.S.H.'s struggles with mental health issues and the unexpected loss of her mother had a deleterious effect. He recommended that D.S.H. engage in psychotherapy in order to achieve reunification with Rachel.
Dr. DeNigris further determined that a bond existed between D.S.H. and Rachel. He stated that he would support reunification with D.S.H. only if she remained compliant with recommended treatment. If D.S.H. failed to complete the treatment, he advised the Division to consider other alternatives, such as termination of D.S.H.'s parental rights in order for R.H. to adopt Rachel.
Dr. DeNigris also found a bond existed between Rachel and R.H., and that she believed R.H. to be her "daddy." He concluded that the severance of either bond in its entirety would constitute a harm to Rachel.
The Law Guardian's bonding expert, Dr. Eric Kirschner, also recommended Rachel's reunification with her mother.
On November 18, 2010, the Division proposed a plan for reunification of Rachel with her mother. A caseworker testified to the bond between D.S.H. and Rachel and to positive changes in D.S.H.'s behavior. The law guardian represented that Rachel "want[ed] to be reunified with mom." The judge approved the plan and closed the case pending a final urine screen of D.S.H.
That same day, D.S.H. submitted a urine sample that showed signs of tampering, as it was "clear and cold," resembling water. D.S.H. failed to appear for a follow-up screen.
On December 2, 2010, the judge held an emergent hearing regarding D.S.H.'s failure to submit to the second test. D.S.H. did not appear. She was ordered to obtain substance abuse treatment, but informed the Division that she would be leaving New Jersey to visit relatives and would call the Division upon her return. She returned and submitted to a substance abuse evaluation on January 4, 2011.
During the evaluation, D.S.H. disclosed Fthat she was on medication for bipolar disorder and taking painkillers for a tooth extraction. She provided another urine sample, which tested negative for drugs; however, the sample again was found to be abnormally diluted.
D.S.H. began treatment at Family Connections on February 15, 2011. Two weeks later, she submitted another adulterated urine sample. On March 11, 2011, she tested positive for cocaine. On March 21 and March 29, 2011, her urine tests again showed abnormal dilution. D.S.H. also *738 missed five meetings at Family Connections.
On April 22, 2011, Dr. DeNigris issued an addendum report based on his review of documents added to the record after his August 2010 evaluation. Dr. DeNigris opined that D.S.H. had not achieved the "criteria necessary that would have made reunification a viable option within the foreseeable future." He maintained that D.S.H. could not provide the support and care Rachel needed because: (1) she had been unemployed for over five years; (2) her home health aide certification was suspended; (3) she was living with a friend, sleeping on the couch; (4) she had a history of mental health issues; (5) she failed to attend psychotherapy regularly; and (6) she exhibited a pattern of aggressive behavior.
Dr. DeNigris testified that the stress of caring for Rachel could cause D.S.H. to relapse into drug abuse and psychiatric symptoms. Dr. DeNigris changed his opinion from August 2010, determining that termination of D.S.H.'s parental rights would be in Rachel's best interest because it would afford her an opportunity to remain permanently with R.H. through adoption. He also stated that any harm suffered by Rachel through her separation from D.S.H. would be mitigated by R.H. He concluded that formalizing her relationship to R.H. would give Rachel a sense of permanency.
Rachel's Division caseworker testified to observing that Rachel calls R.H. "daddy," believes he is her father and has indicated she wants to live with him. She also remarked that they have a good relationship and affirmed R.H.'s desire to adopt Rachel.
R.H. testified that he wanted to adopt Rachel and would continue to allow D.S.H. to see her provided it was safe. He further testified that he had "no bad feelings whatsoever against [D.S.H.]."
D.S.H. also testified, minimizing her drug and violence issues. The trial judge found D.S.H.'s testimony to be incredible.
The court's findings regarding R.H.'s testimony were as follows:
[R.H.] presented as a very dedicated, loving and caring parent. It was clear to the court that his first, and only, priority is [Rachel]. There was also a complete absence of any animus or ill will toward [D.S.H.], his estranged wife and [Rachel's] biological mother. [R.H.] listened attentively and was responsive to all questions posed. In addition, he acknowledged making a mistake, or "bad facts," when he improperly told [Rachel] that her mother did not want her. [R.H.] recognized the error and the matter was appropriately addressed in counseling. The court deems him credible.
The trial judge found that the Division had proved all four prongs necessary to terminate W.W. and D.S.H.'s parental rights under N.J.S.A. 30:4C-15.1(a). In addressing prong four specifically, the judge found that terminating W.W.'s parental rights, which was done by default, would cause no harm to Rachel, since she has no relationship with him whatsoever. The judge determined, however, that terminating D.S.H.'s parental rights would cause harm to Rachel, but found the harm would be mitigated by R.H. because he "understands [Rachel's] relationship with [D.S.H.] and is attuned to [Rachel's] needs."
The judge further noted that Rachel will suffer harm if separated from R.H., and that harm could not be mitigated by D.S.H. The judge based his finding in part on the fact that D.S.H. indicated to Dr. DeNigris that if she obtained physical custody of Rachel she would likely relocate, *739 thereby precluding Rachel from maintaining her relationship with R.H.
The judge ultimately concluded that "[Rachel] would achieve permanency through adoption if [D.S.H.'s] parental rights were terminated. Dr. DeNigris concluded that permanency would give her stability, security, trust and a sense of family that would stay with her for the balance of her life."
We granted D.S.H.'s motion to supplement the record to include her certification indicating that she completed drug treatment on July 15, 2011, and had been permitted only one contact, by phone, with Rachel between June 16 and October 18, 2011.
On appeal, D.S.H. raises the following issues:

POINT I: D.S.H. HAS A CLOSELY BONDED RELATIONSHIP WITH [RACHEL], AND THE TRIAL JUDGE DECIDED PRONG 4 ON THE FALSE REPRESENTATION OF R.H. THAT HE WOULD PERMIT A CONTINUED RELATIONSHIP BETWEEN D.S.H. AND [RACHEL].

POINT II: THE BARE FACT THAT R.H. WAS EXCLUDED AS [RACHEL'S] BIOLOGICAL FATHER DOES NOT PROVE THAT R.H. NEEDS TO ADOPT [RACHEL] IN ORDER TO HAVE PARENTAL RIGHTS AND RESPONSIBILITIES FOR HER.

POINT III: THIS CASE SHOULD BE RESOLVED BY R.H. BRINGING A PRIVATE CUSTODY ACTION FOR [RACHEL] AND CONSOLIDATING IT WITH THE DYFS GUARDIANSHIP ACTION.
The New Jersey Supreme Court has "consistently imposed strict standards for the termination of parental rights." In re Guardianship of K.H.O., 161 N.J. 337, 347, 736 A.2d 1246 (1999). "The balance between parental rights and the State's interest in the welfare of children is achieved through the best interests of the child standard." Ibid. Under that test, termination is never appropriate unless the Division satisfies each of the following four statutory factors by clear and convincing evidence:
(1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
(4) Termination of parental rights will not do more harm than good.
[N.J.S.A. 30:4C-15.1(a).]
The Court has stated that "prong four `serves as a fail-safe against termination even where the remaining standards have been met.'" N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 108, 952 A.2d 436 (2008) (quoting N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 609, 926 A.2d 320 (2007)).
"Because of the elemental nature of the parent-child relationship, and recognizing that the severing of that relationship is among the most `severe and ... irreversible' forms of state action, [our *740 courts] have held that `all doubts must be resolved against termination of parental rights.'" Id. at 102-03, 952 A.2d 436 (quoting K.H.O., supra, 161 N.J. at 347, 736 A.2d 1246) (internal citation omitted).
The question ultimately is not whether a child's interest will be best served by completely terminating the child's relationship with that parent. It has been suggested that [a] decision to terminate parental rights should not simply extinguish an unsuccessful parent-child relationship without making provisions for... a more promising relationship ... [in] the child's future.
[Id.]
Thus, "courts have recognized that terminating parental rights without any compensating benefit, such as adoption, may do great harm to the child." Id. at 109, 952 A.2d 436 (citing N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 610-11, 512 A.2d 438 (1986)).
We agree with D.S.H. that under these circumstances, the Division has, as a matter of law, failed to prove that termination of her parental rights will not do more harm than good. In his report, Dr. DeNigris found a strong bond between mother and daughter. Although he ultimately endorsed terminating D.S.H.'s parental rights and concluded that such action would not do more harm than good, his primary rationale for doing so was to facilitate Rachel's adoption by R.H.
Notably, however, if R.H. was deemed to be Rachel's legal father by virtue of a paternity test, the Division would not have moved to terminate D.S.H.'s parental rights. We know this because the Division did not move to terminate D.S.H.'s parental rights with regard to her younger daughter, Catherine, who is in the legal and physical custody of her unmarried biological father.
Furthermore, Rachel's relationship with her mother is presumably stronger than that of Catherine, who has been in her father's custody since birth. Rachel lived primarily with D.S.H. for the first four years of her life and, as determined by Dr. DeNigris, is closely bonded to her. The record reveals numerous instances in which Rachel expressed her desire for reunification with her mother.
Dr. DeNigris also found the presence of a strong bond between Rachel and R.H. Believing that R.H. and D.S.H. had an agreement "to continue to allow [Rachel] to have contact with the other regardless of where she is permanently placed," he opined that "this would be important to [Rachel] as she would be able to maintain contact with two people who clearly love her."[2] Though the results of a court-ordered paternity test indicated that R.H. is not Rachel's biological father, that result is not dispositive to our consideration of his status as Rachel's legal father.
In New Jersey, parenthood is not merely a biological determination. See M.F. v. N.H., 252 N.J.Super. 420, 429, 599 A.2d 1297 (App.Div.1991). In M.F., we held that a court should not order a paternity test over the objection of the mother and her husband unless it determines by clear and convincing evidence that it is in the best interests of the child. This is so because "[t]he shifting of paternity from the presumed father to the biological father could easily be detrimental to the emotional and physical well-being of any child." Ibid. We further noted that, in some cases, the best interests of the child *741 "will be better served by no paternity determination at all." Id. at 427, 599 A.2d 1297.
In addition to paternity testing, fatherhood may be demonstrated through a psychological relationship. See Watkins v. Nelson, 163 N.J. 235, 254, 748 A.2d 558 (2000) (explaining in the context of a custody dispute that "when a third party, such as a stepparent, establishes psychological parentage with the child, the third party stands in the shoes of a natural parent.") (citation omitted); V.C. v. M.J.B., 163 N.J. 200, 219-20, 748 A.2d 539 (2000) (citing a multitude of Appellate Division cases recognizing psychological parentage in the custodial context); see also Michael H. v. Gerald D., 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989) (finding no constitutional infirmity in severing an established relationship between a child and her biological father in favor of a relationship between the child and her mother's husband); Monmouth Cnty. Div. of Soc. Servs. v. R.K., 334 N.J.Super. 177, 757 A.2d 319 (Ch.Div.2000) (finding the mother's former boyfriend was the child's psychological father and thus was equitably estopped from denying paternity for purposes of paying child support). A third party asserting psychological parentage must satisfy the four-part standard announced in V.C., supra, 163 N.J. at 223, 748 A.2d 539. To establish psychological parentage, "the legal parent must consent to and foster the relationship between the third party and the child; the third party must have lived with the child; the third party must perform parental functions for the child to a significant degree; and most important, a parent-child bond must be forged." Ibid.
"At the heart of the psychological parent cases is a recognition that children have a strong interest in maintaining the ties that connect them to adults who love and provide for them." V.C., supra, 163 N.J. at 221, 748 A.2d 539. In the context of custody and visitation disputes, "[o]nce a third party has been determined to be a psychological parent to a child ... he or she stands in parity with the legal parent." Id. at 223-27, 748 A.2d 539 (announcing the standard for determining how a third party establishes psychological parentage).
Neither the Division nor D.S.H. dispute R.H.'s status as Rachel's psychological parent. The issue presented is whether, in the alleged[3] absence of a biological link between Rachel and R.H., the law requires termination of D.S.H.'s parental rights and adoption by R.H. to achieve stability and permanence for Rachel. Based on the narrow scope of this question, we need not address whether awarding sole legal and physical custody to a psychological parent satisfies the permanency requirement found in State and Federal law.[4]See N.J.S.A. 30:4C-1(f); N.J.S.A. 9:3-37 to -56; Pub.L. No. 105-89, 111 Stat. 2115; see also N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 513, 852 A.2d 1093 (2004) (stating that kinship legal guardianship, as an alternative to termination of *742 parental rights, may be considered only "when adoption is neither feasible nor likely and kinship legal guardianship is in the child's best interests.") (internal quotations omitted).
Under the circumstances in this case, R.H. is not only a psychological parent to Rachel. He is her legal father. He is named as Rachel's father on her birth certificate. As R.H. and D.S.H. were married at the time of Rachel's birth, he is her presumptive father under N.J.S.A. 9:17-43(a)(1). No one else seeks to be named as Rachel's father. At age eight, Rachel believes R.H. is in every way her father, and has known only him in that role. D.S.H. now also agrees that R.H. is Rachel's legal father.
Moreover, R.H. has no desire to relinquish that status, as evidenced by the following statements made to Dr. DeNigris:
The [S]tate told me [Rachel] was not my daughter. I don't want [Rachel] to be apart from me. They told me I could become a foster parent. I just found out in 2010 that she wasn't mine. I don't believe that test. To me, that test wasn't right. I still believe she's my (biological[5]) daughter ... [Regarding adoption, t]o be honest, I think she'd be permanent now. I'm not planning to give her back.
At trial, when asked to describe his response to the results of the paternity test, R.H., who is from Jamaica, testified to feeling "like everything mash up, sir. Like the whole world crumbled down."
When asked why he went through training to become a foster parent, he stated he did so "[b]ecause they told me that the only way I could keep [Rachel] is less I adopt her as my own. And I told them that she's my own already. But they say that II got to go through the right procedure to get this done."
The order dismissing R.H. from this litigation did not state that he was determined not to be Rachel's father. Moreover, the order, as part of this litigation, is confidential. See N.J.S.A. 9:6-8.10a; R. 5:12-4(b). Thus, in the records kept by the Office of Vital Statistics and Registry, R.H. remains Rachel's legal father.
The Division maintains that R.H.'s dismissal from the protective services litigation was intended to serve also as a finding, based on the paternity test, that R.H. was not Rachel's legal father. Importantly, however, the order merely dismisses R.H. from the litigation. The statutory presumption of paternity resulting from a test "indicating a 95% or greater probability that the alleged father is the father of the child" created by N.J.S.A. 9:17-48(i) does not, on its face, apply to these circumstances, where non-paternity is alleged.[6] A scientific test is not the functional equivalent of a court order; nor does a paternity test negating paternity automatically result in a court order of non-parentage. No order of non-paternity was entered here and we have reason to believe from his statements that R.H. would have contested the entry of such an order, if given the opportunity.
Two parents are better than one, even if one parent falls far below the ideal, as the Division recognized by not moving to terminate D.S.H.'s parental rights to Catherine. The law generally *743 recognizes the importance of a child maintaining a close relationship with both parents. See N.J.S.A. 9:2-4 (expressing the Legislature's findings that "it is in the public policy of this State to assure minor children of frequent and continuing contact with both parents after the parents have separated ..."); McCown v. McCown, 277 N.J.Super. 213, 218, 649 A.2d 418 (App. Div.1994). In McCown, supra, we stated in the context of a post-judgment matrimonial motion that "the severance of the ties to either parent is contrary to the child's best interest. The child should be able to recognize both parents as sources of security and love and should wish to continue both relationships." 277 N.J.Super. at 218, 649 A.2d 418 (emphasis in original) (citations omitted).
The strength of the bonds between Rachel and both of her parents is not disputed. Although Dr. DeNigris determined that R.H. would mitigate any harm suffered, severing all ties between Rachel and D.S.H. could have a long-term, deleterious effect on Rachel's sense of self-worth. A child whose relationship with a parent is permanently severed because that parent is deemed unfit may well suffer severe psychological repercussions, especially if that child discovers that the unfit parent is the only known biological parent. See Moriarty v. Bradt, 177 N.J. 84, 121-22, 827 A.2d 203 (2003) (finding sufficient harm in the potential loss of self-esteem to the children, who could come to believe that they are half-evil if alienated from their maternal side of the family, so as to outweigh the father's right to restrict grandparental visitation).
We agree with D.S.H. that the evidence in this case demonstrates that Rachel's best interests are better served by continued contact with both parents. We further agree that R.H. continues to be Rachel's legal parent as a matter of law. It is therefore unnecessary to terminate D.S.H.'s parental rights to achieve permanency and stability for Rachel with her father.
Although the Division and Rachel appear as adversaries to D.S.H. in this appeal, we view a determination that R.H. is Rachel's legal father to be consistent with Rachel's expressed desires and the Division's actions regarding Catherine, and in harmony with the Division's general acceptance that two parents are better than one. Thus, we view this result as beneficial to all concerned.
Reversed.
NOTES
[1] We refer to the children by fictitious names to protect their identity.
[2] If R.H. was to adopt Rachel, the agreement to maintain contact between Rachel and D.S.H. would be deemed an open adoption, which is unenforceable in New Jersey. See In re Adoption of a Child by W.P., 163 N.J. 158, 171-73, 748 A.2d 515 (2000).
[3] We use the word "alleged" because R.H. was not, to our knowledge, given the opportunity to contest the findings of the paternity test. See N.J.S.A. 9:17-48(d), (i).
[4] After enactment of the federal Adoption and Safe Families Act of 1997 (ASFA), Pub.L. No. 105-89, 111 Stat. 2115, "New Jersey passed `An Act concerning children and families,' L. 1999, c. 53 (codified as amended in scattered sections of N.J.S.A. 9 and 30:4C), to bring New Jersey law into conformity with ASFA. New Jersey's revisions reemphasized the importance of permanency to a child's well-being and the need for efficient and timely action to achieve that goal." N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 198, 996 A.2d 986 (2010).
[5] Dr. DeNigris added "biological" to the words actually spoken by R.H.
[6] That statutory presumption allows the admission of a paternity test in contested cases, generally for the purpose of establishing a child support obligation, without the necessity of a full evidentiary hearing.