**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-3222-16T1
              A-3223-16T1

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

M.F. and R.J.,

    Defendants-Appellants.

_____

IN THE MATTER OF M.J.,

    a Minor.

_____

Argued September 24, 2018 – Decided October 22, 2018

Before Judges Sumners and Mitterhoff.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FN-13-0228-15.

Deric D. Wu, Assistant Deputy Public Defender, argued the cause for appellant M.F. (Joseph E. Krakora,

Public Defender, attorney; John A. Salois, Designated Counsel, on the briefs).

Mark E. Kleiman, Designated Counsel, argued the cause for appellant R.J. (Joseph E. Krakora, Public Defender, attorney; Mark E. Kleiman, on the brief).

Deirdre A. Carver, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Deirdre A. Carver, on the brief).

Rachel E. Seidman, Assistant Deputy Public Defender, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Rachel E. Seidman, on the brief).

PER CURIAM

In these back-to-back appeals, which have been consolidated for the purpose of this single opinion, defendants M.F. (Mindy)[1] and R.J. (Randy) seek review of the Family Part judge's order granting custody of six-year-old M.J. (Mary) to the Division of Child Protection and Permanency (Division). Among other things, the judge determined that, in accordance with V.C. v. M.J.B., 163 N.J. 200 (2000), defendants were not Mary's psychological parents. We affirm substantially for the sound reasons expressed by the judge in his oral decision.

---

[1] We use initials and pseudonyms to protect the identities of the parties involved.

The record reveals the unfortunate travails of how Mary came within the jurisdiction of our courts. Mary's mother P.R. (Penny) was a prostitute in Florida. After Mary was born, Penny relinquished custody of Mary to Mindy and her live-in boyfriend, Randy, with the approval of the Florida Department of Child and Families (FDCF).[2] Penny listed Randy as the biological father on her Florida birth certificate. When Mindy and Randy had a brief separation, he had sex with Penny on one occasion.

In early October 2014, when Mary was four years old, she came under the sole care of individuals – who had lived with Mindy and Randy for a few months after they lost their home in a fire – because Mindy was hospitalized and Randy was incarcerated. Concerned over Mary's well-being, Mindy made a Facebook post seeking help from her "friends" rather than contacting child protective services or law enforcement.

At the end of the month, Mindy's friend Amy, who resided in New Jersey, was vacationing in Florida when she visited Mindy in the hospital. When Amy went to check on Mary, she saw that Mary was living in deplorable conditions – a home with broken windows, dog feces and urine throughout – Amy obtained

---

[2] FDCF was contacted because tests revealed that Mary was born with drugs in her system.

A-3222-16T1

Mindy's permission to have Mary spend the week with her family in Disney World. Thereafter, Mindy permitted Amy to take Mary back to New Jersey, without appropriate documentation for Mary's medical care, until Mindy was out of the hospital.

In mid-December 2014, Mary came under the care of Amy's sister, Kelly, because she had children closer to Mary's age. Plans to return Mary to Florida under Randy's care in January 2015, were scrubbed due to Mary's continued illness. Apparently, Randy did not seek to reobtain custody of Mary after he was released from incarceration.

Eventually, in April 2015, the Division was contacted because Mary needed extensive dental care[3] and no one in New Jersey had the legal authority to consent to her treatment. The Division then filed a complaint for emergent custody, care and supervision of Mary. At the order to show cause hearing, defendants, appearing by telephone,[4] requested that Mary be returned to them in Florida, or placed in the care of Amy or Kelly. The Division objected, based upon the request from the FDCF. Upon notifying the FDCF that Mary was under

---

[3] Mindy denied that she had failed to provide Mary adequate dental care but acknowledged that Mary had four teeth pulled at the age of two due to bottle rot.

[4] All of defendants' appearances were by telephone.

its care and custody, the Division was advised by the FDCF to hold off on sending Mary back to Florida and defendants because it was commencing an investigation due to concerns identified in a prior investigation about defendants' substance abuse and inadequate supervision of Mary.

Judge Terence Flynn ordered that Mary remain in New Jersey under the custody of the Division. The judge cited the circumstances in which defendants allowed Mary to be poorly cared for by unsuitable individuals in their absence and to go to New Jersey without provision for Mary's medical care. The judge also took note of Randy's lack of interest in regaining custody of Mary after he got out of jail. In addition, he ordered Randy to take a paternity test given that Mary's alleged conception resulted from his one-time sexual encounter with Penny, a prostitute at the time. Defendants were granted supervised visitation contingent on confirmation that Randy was Mary's biological father.

After initially refusing to be tested, claiming he was named as Mary's father on her birth certificate, Randy cooperated. Paternity testing revealed that he was not Mary's father.[5] In fact, when Penny later surrendered her parental

---

[5] Randy was thus encouraged by the judge to make an application to terminate his child support obligation.

rights she acknowledged that although she identified Randy as Mary's father on the birth certificate, she was uncertain who Mary's biological father was.[6] Despite never obtaining a court order granting him custody of Mary, Randy claimed that he was not incarcerated – from July 2011 until December 2012 and from September 2014 to January 2015 – he financially supported her and took her to her medical and dental appointments.

The judge accepted the Division's goal of adoption, pending the outcome of defendants' application to be designated Mary's psychological parents. To prove they were her psychological parents, defendants' petition had to prove:

> (1) that the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child; (2) that the petitioner and the child lived together in the same household; (3) that the petitioner assumed the obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation [a petitioner's contribution to a child's support need not be monetary]; and (4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.
>
> [V.C., 163 N.J. at 223. (citation omitted)]

---

[6] Despite Penny's initial desire to have defendants adopt Mary, she no longer wanted Mary returned to their care because she saw them use drugs in Mary's presence.

A-3222-16T1

Proof that a third party has become a child's psychological parent by assuming the role of his or her legal parent who has been unable or unwilling to undertake the obligations of parenthood will suffice to establish exceptional circumstances. Id. at 219. Such proof will place the third party "in parity" with the legal parent. Id. at 227.

To support the assertion that they were Mary's psychological parents, defendants testified about how they starting taking care of Mary with Penny's approval upon her birth. Mindy further explained how she saw that Mary was cared for by Amy when she took ill and Randy was incarcerated.

To oppose defendants' application, the Division presented the testimony of Mary's resource parent. He stated that when Mary came under his care at the age of two-and-a-half, she weighed twenty-four pounds and her teeth were infected and bleeding, which required four root canals, five caps, two fillings and a bridge. Initially, Mary would have episodes when she would hit herself and bite her skin off her hands. He also stated she exhibited sexualized behaviors and indicated that Randy had hit her while caring for her.

The Division also presented the expert testimony of psychologist, Dr. David Brandwein, who had conducted a bonding evaluation of defendants with Mary. He opined that even though Mary had been separated from defendants a

little over two years prior to the evaluation, if there was a bond, it could withstand periods of separation provided Mary received adequate care from defendants. Based upon his observation, he saw no remnants of a bond between Mary and defendants despite the fact that she recalled living with them.

Applying the four-prong V.C. test, Judge Flynn determined defendants failed to establish that they were Mary's psychological parents. The judge found there was no dispute that the first and second prongs of the test were established because Penny had relinquished physical custody of Mary to defendants and Mary lived with them for the first four years of her life. But, relying substantially on Brandwein's credible and unrebutted expert testimony, he found defendants failed to establish V.C.'s third and fourth prongs. He stated in his oral decision:

> The third prong . . . . The [c]ourt is not completely convinced that this particular prong has been established primarily relying on some of the facts in the case which I will discuss a little bit later in discussing what appears to be the legitimacy of Dr. Brandwein's findings.
>
> And finally, the fourth prong . . . . The [c]ourt sees this fourth prong to be a consideration in the present as opposed to the past. To the extent that there may have been bond in the past, it is not sufficient to establish simply a past bond. The question is at this particular time, at the time of the petition[], whether there does exist a bond.

. . . .

> Now, the [c]ourt heard the testimony of Dr. David Brandwein. Dr. Brandwein was qualified as an expert in this case. His background was stipulated to by the parties, and he testified with regard to not only the psychological evaluations he did of both [Mindy] and [Randy] but also his bonding evaluation that he conducted with the petitioners and [Mary].
>
> The [c]ourt has had opportunity to hear Dr. Brandwein in the past, in this particular case [the court] credited his testimony, finding his observations to be both insightful and useful to the [c]ourt in making or rendering its opinion here.

Judge Flynn then noted some of the salient facts in the record. When Mary was under the defendants' care in Florida, Randy was absent from the household for significant periods of time due to his incarceration; and while Mindy was hospitalized, she left Mary in the care of unfamiliar people. The judge found that Mary's extensive dental issues were indicative of the inadequate care provided by defendants. He further pointed out that throughout Mary's time in New Jersey, neither defendant made an effort to visit, contact, or fulfill any of rightful parental duties for Mary. In short, the judge determined, Mary "does not have an intimate memory of [her] relationship with [Randy] and [Mindy], and to the extent that Dr. Brandwein found that the relationship between them and [Mary] is tenuous at best, the [c]ourt has to wholeheartedly agree."

Consequently, the judge terminated the FN litigation and entered a judgment of guardianship in favor of the Division due to Penny's surrender of parental rights and the lack of an identified father.

Before us, defendants essentially contend that because Randy was Mary's legal father under both Florida and New Jersey law, the judge should not have conducted a hearing under V.C. to determine if he and Mindy were Mary's psychological parents, and instead he should have determined if they were fit to parent. Alternatively, they argued that the judge erred in determining that they were not Mary's psychological parents. In addition, Randy argues that he was denied effective assistance of counsel when his trial counsel did not object to a hearing under V.C. to determine if he was Mary's psychological parent. We find no merit to defendants' contentions, and we affirm substantially for the sound reasons expressed by Judge Flynn in his oral decision. We add the following comments.

Neither Florida nor New Jersey law support defendants' argument that Randy is Mary's legal parent because he was named as her father on her Florida birth certificate. Fla. Stat. § 742.10 provides:

> (1) Except as provided in chapters 39 and 63, this chapter provides the primary jurisdiction and procedures for the determination of paternity for children born out of wedlock. If the establishment of

paternity has been raised and determined within an adjudicatory hearing brought under the statutes governing inheritance, or dependency under workers' compensation or similar compensation programs; if an affidavit acknowledging paternity or a stipulation of paternity is executed by both parties and filed with the clerk of the court; if an affidavit, a notarized voluntary acknowledgment of paternity, or a voluntary acknowledgment of paternity that is witnessed by two individuals and signed under penalty of perjury as provided for in s. 382.013 or s. 382.016 is executed by both parties; or if paternity is adjudicated by the Department of Revenue as provided in s. 409.256, such adjudication, affidavit, or acknowledgment constitutes the establishment of paternity for purposes of this chapter. [(Emphasis added.)]

Since there was no "adjudication, affidavit, or acknowledgment" as set forth in the statute, Randy – who was not married to Penny – was not Mary's father under Florida law.

Accordingly, Judge Flynn correctly found that Randy could not be recognized as Mary's father under New Jersey law absent a ruling in Florida that he was the father. N.J.S.A. 9:17-41(b), provides that paternity

may be established by proof that [the father's] paternity has been adjudicated under prior law; under the laws governing probate; by giving full faith and credit to a determination of paternity made by any other state or jurisdiction, whether established through voluntary acknowledgment or through judicial or administrative processes.

Nevertheless, our state recognizes that although Randy was never married to Mary's mother, he is presumptively her father under N.J.S.A. 9:17-43(a)(4)-(5) because he took her into his home, provided her support, and has always openly held her out as his natural child. The presumption, however, is rebuttable by clear and convincing evidence that Randy is not the child's biological father. N.J.S.A. 9:17-43(b). Based upon the testimony of Penny and defendants, there was clearly a question of paternity that was properly and unquestionably resolved by genetics testing. See N.J.S.A. 9-17-48(d); see also D.W. v. R.W., 212 N.J. 232, 236 (2012); Flores v. Sanchez, 137 So. 3d 1104, 1107 (Fla. Dist. Ct. App. 2014). The paternity test rebutted any assertion, birth certificate notwithstanding, that Randy was Mary's father.

Because Penny surrendered her parental rights, it was appropriate for Judge Flynn to determine if defendants, who were not Mary's biological parents, were instead Mary's psychological parents. Div. of Youth & Family Servs. v. D.S.H., 425 N.J. Super. 228, 239 (App. Div. 2012) (stating in the absence of a biological connection, "fatherhood may be demonstrated through a psychological relationship."). Moreover, defendants, relying on the strength of their argument that they had cared for Mary for a significant period of time, agreed that the four-prong test under V.C. should be applied. Because the

12

judge's finding that defendants failed to establish they were Mary's psychological parents is "'supported by adequate, substantial, credible evidence,'" Elrom v. Elrom, 439 N.J. Super. 424, 433 (App. Div. 2015) (quoting Cesare v. Cesare, 154 N.J. 394, 411–12 (1998)), we conclude there is no reason to upset it. In turn, Randy had no parental rights, as he contends, under Title 9 or Title 30, and his due process rights were not violated as he participated in the entirety of the trial court proceedings.

Lastly, we address Randy's contention that his counsel was ineffective by failing to proffer the birth certificate to show he was Mary's legal parent or guardian and did not object to the judge's application of V.C. to determine if he was Mary's psychological parent instead of arguing that she had parental or guardian rights under Title 9 or Title 30.

To sustain a claim of ineffective assistance of counsel, Randy must satisfy the two-part test set forth in Strickland v. Washington, 466 U.S. 668 (1984), that

> (1) counsel's performance must be objectively deficient--i.e., it must fall outside the broad range of professionally acceptable performance; and (2) counsel's deficient performance must prejudice the defense--i.e., there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."
>
> [N.J. Div. of Youth & Family Servs. v. B.R., 192 N.J. 301, 307 (2007) (citing Strickland, 466 U.S. at 694).]

We may resolve the question of ineffective assistance of counsel on the appeal record alone, unless a genuine issue of fact is present, in which case a remand for an expedited hearing before the trial court is necessary to determine the factual question. Ibid.

The record here does not necessitate a remand, and we find insufficient merit in Randy's argument to warrant extensive discussion in a written opinion. R. 2:11-3(e)(1)(E). We briefly add that because the paternity test ruled out Randy as Mary's father, there was no legal or factual basis for proving his fatherhood through the Florida birth certificate, and, therefore, applying V.C. was the only legal alternative to determine if he and Mindy had any rights to obtain custody of Mary.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3222-16T1