RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-3931-15T2
 A-3933-15T2

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

 Plaintiff-Respondent,

v.

A.A. and E.L., Sr.,

 Defendants-Appellants.
__________________________________

IN THE MATTER OF THE GUARDIANSHIP
OF E.L., Jr. and N.L., minors.
__________________________________

 Argued May 31, 2017 – Decided July 11, 2017

 Before Judges Koblitz, Rothstadt and Sumners.

 On appeal from Superior Court of New Jersey,
 Chancery Division, Family Part, Essex County,
 Docket No. FG-07-0110-16.

 Beatrix W. Shear, Designated Counsel, argued
 the cause for appellant A.A. (Joseph E.
 Krakora, Public Defender, attorney; Ms. Shear,
 on the briefs).

 Stephen Edward Miklosey, Designated Counsel,
 telephonically argued the cause for appellant
 E.L., Sr. (Joseph E. Krakora, Public Defender,
 attorney; Mr. Miklosey, on the brief).
 Sarah K. Bennett, Deputy Attorney General,
 argued the cause for respondent (Christopher
 S. Porrino, Attorney General; Andrea M.
 Silkowitz, Assistant Attorney General, of
 counsel; Ms. Bennett, on the brief).

 Karen A. Lodeserto, Designated Counsel, argued
 the cause for minors (Joseph E. Krakora,
 Public Defender, Law Guardian, attorney; Ms.
 Lodeserto, on the brief).

PER CURIAM

 In this consolidated appeal, defendants A.A. (Amy)1 and E.L.,

Sr., (Edgar) appeal from the April 27, 2016 Judgment of

Guardianship terminating their parental rights to their sons,

E.L., Jr., (Eric) and N.L. (Neil). We remand Edgar's case for a

supplemental hearing and affirm the termination of Amy's parental

rights, with the proviso that she may reopen the matter if Edgar's

parental rights are not terminated after remand.

 I

 Eric, born in 2012, and Neil, born two years later, are the

biological children of Amy and Edgar. Edgar is also the father

of N.J. (Natalie), born at the end of 2009, and I.L., born in

2006, who are not a party to the guardianship action under appeal.

Amy is also the mother of N.A., born in 2007, who is not a party

to this action and is in the custody of his paternal grandfather.

1
 We use pseudonyms and initials to refer to the parties pursuant
to Rule 1:38-3(d)(12).
 2 A-3931-15T2
 The Division of Child Protection and Permanency (Division)

became involved with the family following multiple unsubstantiated

referrals beginning in April 2012 alleging abuse to Edgar's

daughter Natalie, who was being cared for by Amy. In December

2013, Natalie's daycare reported abuse that was substantiated.

Daycare staff reported Amy had shaken four-year-old Natalie,

slammed her into a chair and onto the floor, and punched her on

the legs. Amy admitted hitting Natalie. In January 2014, the

Division supplied parent aide services to the family.

 Amy and Edgar were evaluated by Dr. Leslie J. Williams in

February 2014. Dr. Williams recommended psychotherapy and

parenting classes for both parents as well as anger management for

Edgar. Dr. Williams stated Amy would "benefit from psychotherapy

to address her low self-esteem and increase her problem solving

ability."

 The Division received another substantiated referral

concerning Natalie in June 2014. During a visit by the Division,

the worker observed that Natalie had two black eyes. When

questioned, Edgar stated that Natalie was hit in the left eye

during a football game on Memorial Day weekend. He first stated

the bruise to her right eye was caused by Natalie falling down and

hitting a radiator, and then said the eye became swollen by a

mosquito bite. A medical examination of Natalie revealed a

 3 A-3931-15T2
healing, child-sized bite mark on her back, two black eyes, linear

and patterned marks and scars on her legs that suggested multiple

impacts with a linear or patterned object, multiple insect bites,

and lesions on her left hand and back. The Division substantiated

the allegation due to the unexplained physical injuries with

contradictory explanations, medical neglect, and inadequate

supervision. Medical records further corroborated a pattern of

neglect: Natalie was brought to the emergency room seven times

between 2011 and 2014. Both Eric and Natalie were removed from

the home on an emergent basis in June 2014.

 Dr. Williams conducted another psychological evaluation of

Amy and Edgar in July 2014. Dr. Williams found Edgar scored in

the "low average range" of intelligence, and Amy scored in the

"borderline intellectual functioning" range. Dr. Williams renewed

his earlier recommendations, adding that services should take into

account the defendants' level of intelligence. He concluded both

parents were unable to provide adequate parenting. In August

2014, defendants began therapy and parenting skills classes.

 During the ensuing Division investigation, Amy stated the

cause of Natalie's unexplained injuries were nearly daily beatings

administered by her and Edgar. She said she beat Natalie with her

hand. The bruises to Natalie's eyes were the result of Natalie

not staying still while Edgar beat her with a belt. In addition,

 4 A-3931-15T2
Edgar would at times fail to feed Natalie. Amy stated that she

was also victimized by Edgar; however, she refused to discuss the

matter with a domestic violence liaison. On October 17, 2014, Amy

and Edgar voluntarily stipulated to inadequate supervision of

Natalie.

 Later that month, Neil was born and custody was granted to

the Division five days after his birth. Neil was placed directly

from the hospital. After initial placement with non-relatives,

the two boys were placed with their paternal grandmother in

November 2016, where they remain.

 Dr. Samiris Sostre conducted a psychological evaluation of

Amy in November 2014. Amy told Dr. Sostre she spanked Natalie,

and Edgar hit the child with a belt. Amy also related domestic

violence issues with Edgar, but maintained the issues had been

resolved. Dr. Sostre found that Amy had impaired judgment and

concentration and poor insight. She opined Amy's cognitive

disabilities would not improve and her dependent personality would

hinder her ability to act in the children's best interests,

concluding "prognosis for improvement [is] guarded."

 In February 2015, Dr. Williams evaluated Amy for a third

time. He stated Amy required lifelong treatment that is "focused

and direct, and geared to [her] intellectual capacity," and that

her unaddressed domestic violence issues constituted a risk to any

 5 A-3931-15T2
child in her care. The same month, Dr. Sostre evaluated Edgar.

Edgar denied being violent to Amy or Natalie. Dr. Sostre opined

that Edgar's impulse control, denial, and lack of parental concern

demonstrated a lack of progress on his part, rendering

reunification unadvisable.

 At the request of Edgar's counsel, Dr. James R. Reynolds

evaluated Edgar the following month. Dr. Reynolds stated in his

report that, while Edgar possesses knowledge of "children's

developmental capabilities and emotional needs," he "may be overly

restrictive of children becoming autonomous in an age- and

developmentally-appropriate manner," and he "may also conflate

parent and child roles, possibly expecting children to provide a

level of emotional support to their parents which is not

appropriate." Dr. Reynolds concluded, however, that Edgar

"appears to possess the capacity to benefit from parenting classes

and other types of parental assistance" as long as those services

were modified to accommodate [his] cognitive limitations."

 In April 2015, Amy told the Division during a visit about an

incident when Edgar pulled her hair and put his hands around her

neck to choke her. Both parents were referred for domestic

violence counseling and parenting classes. The parties separated

four months later.

 6 A-3931-15T2
 In September 2015, Dr. Jonathan H. Mack, a licensed doctor

of psychology with expertise in neuropsychology, conducted a

neuropsychological and psychological evaluation of Edgar on behalf

of the Division. Dr. Mack's report stated, "[Edgar's] personality

features that make him overly reactive, inclined to domestic

violence, incapable of holding a job, and markedly over reactive

in his personal life" were the result of traumatic brain injury

and seizure disorder stemming from a car accident in 2008 or 2009.

Dr. Mack opined: "[Edgar] is not capable of being a minimally

effective parent in the foreseeable future, regardless of any

interventions that were to be taken."

 From November 2015 to January 2016, Dr. Sean P. Hiscox

conducted separate bonding and psychological evaluations of Amy

and Edgar. In an interview, Edgar admitted to a 2007 simple

assault charge against him by a prior girlfriend and instances of

mutual aggressiveness between him and Amy.

 In her interview with Dr. Hiscox, Amy reported moving in with

her unemployed, twenty-two-year-old boyfriend of one month and his

family. In bonding evaluations, Dr. Hiscox observed loving

behavior by both parents toward the boys, but stated, "their

relationship is more reflective of a positive relationship often

found with an extended family member . . . not a central attachment

figure."

 7 A-3931-15T2
 In July 2016, the court conducted a two-day guardianship

trial. The Division offered the testimony of a Division caseworker

and psychologist Dr. Hiscox as well as voluminous records. Amy

testified as did her expert, Dr. Reynolds. Edgar did not testify

and did not attend the second day of trial.

 II

 Both of the Division's witnesses testified to the unstable

living conditions of Edgar and Amy. The caseworker testified that

at the time of trial defendants were unemployed, and neither party

had stable housing. Amy was living with a friend, while Edgar had

no fixed address. During the first three months of 2016, Amy

missed five therapeutic visits with the children and was late to

two. Edgar missed two visits. During one visit, Amy

inappropriately pinched Eric as a form of discipline.

 Dr. Hiscox expressed strong concerns stemming from the

parents' poor judgment, lifestyle instabilities, and relationship

instabilities. He noted Edgar was "transient," staying with a

friend for a week or two before moving on, and that he was

unemployed, surviving on money from friends and family. Edgar

told Dr. Hiscox that "he was not looking for employment," then

altered his story to say he actually had a good job opportunity

lined up working at a grocery store. Edgar estimated he would be

in a position to care for the children by winter 2016, at which

 8 A-3931-15T2
time "he planned on moving out of New Jersey and moving to a place

where nobody knows who he is so that he can start fresh."

 Dr. Hiscox had concerns about Amy's stability as well, noting

that the day he interviewed her, she was moving in with a boyfriend

whom she had known for only a few weeks. She admitted knowing

little about him, other than he was unemployed and receiving

governmental benefits. She did not know why he received the

benefits. Dr. Hiscox stated his concern was heightened by the

fact that Amy's plan for her children was to bring them into a

home with someone whom she had just met. Amy was unemployed.

 Dr. Hiscox also testified regarding defendants' intellectual

limitations, stating "low intellectual ability often leads to

poorly thought out choices, difficulty with delaying gratification

and impulsivity in that regard in terms of decision-making."

 Dr. Hiscox concluded termination of Amy and Edgar's parental

rights was appropriate and it would not do more good than harm,

as he could not "foresee a situation where they would ever be in

a position to be fit enough to care for these boys." Termination

would give the children a chance to achieve permanency. He stated

that termination of parental rights "would not result in severe

and enduring harm to the children."

 Amy's expert, Dr. Reynolds, testified there was a parental

bond between the children and Amy. He did express concerns about

 9 A-3931-15T2
Amy's stability, testifying that in the short time between his and

Hiscox's evaluations, "she changed her residence, quit her jobs,

[and] she moved in with her boyfriend." Dr. Reynolds noted Amy

presented a different explanation to Dr. Hiscox regarding how she

met the new boyfriend, contradicting her account to Dr. Reynolds.

Amy's history of employment, residential, and relationship

instability was symptomatic of a dependent personality disorder,

as diagnosed by Dr. Sostre.

 Dr. Reynolds concluded that although Amy was not currently

capable of parenting, "if [she] was provided additional parenting

services and additional psychotherapy services that account for

her intellectual limitations" it would be possible to tell "within

the foreseeable future . . . whether or not she would be able to

parent in the future." Reynolds stated he thought "[t]he

Division's done a really good job . . . of identifying particular

services that she requires and from which she could benefit." Amy

testified she had completed parenting classes and individual

therapy.

 The judge rendered an oral decision, finding by clear and

convincing evidence all four prongs of the best interests test,

N.J.S.A. 30:4C-15.1(a), and that termination of defendant's

parental rights was in the children's best interests. As to the

first prong, the judge found Amy and Edgar caused the physical

 10 A-3931-15T2
abuse endured by Natalie. As to the second prong, the judge found

defendants "have not stabilized in any way" in the two years since

the Division first became involved and "appear to be incapable

. . . of being able to correct the deficiencies and problems that

led to the removal." The judge pointed to Edgar's plan to "runaway

to someplace" where he is unknown in order to start over with the

kids as evidence of his unwillingness or inability to provide

permanency. The judge stated Edgar's transient living situation

demonstrated instability. Amy's own expert testified Amy could

not presently parent the children, and the expert could not predict

whether additional services would be effective.

 As to the third prong, the judge found the Division had made

reasonable efforts, and, in some instances, "services have been

repeated."

 As to the fourth prong, the judge relied on Dr. Hiscox's

testimony characterizing the parental relationship as similar to

a relationship among "extended family member[s]" or "playmates,"

lacking a deep parent-child bond. The judge found "Dr. Hiscox['s]

description of the bond . . . as an extended family type of bond

. . . makes sense just from the standpoint of the time that they've

spent together and the types of activities they've done together."

He found the children did not believe they could "rely on these

particular parents to be the ones that care for them on a day to

 11 A-3931-15T2
day basis or [that defendants were capable of] form[ing] that type

of bond." The judge found that any harm from severing the bond

would "be mitigated . . . by placing them in a stable permanent,

loving relationship where they are well cared for." The judge,

therefore, found termination of parental rights would not do more

harm than good.

 III

 "We will not disturb the family court's decision to terminate

parental rights where there is substantial credible evidence in

the record to support the court's findings." N.J. Div. of Youth

& Family Servs. v. E.P., 196 N.J. 88, 104 (2008). In light of the

Family Part's "special jurisdiction and expertise in family

matters" and its opportunity to assess witnesses first-hand and

develop a "feel of the case," we accord deference to the Family

Part's findings of fact and credibility. N.J. Div. of Youth &

Family Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (first quoting

Cesare v. Cesare, 154 N.J. 394, 413 (1998); then quoting E.P.,

supra, 196 N.J. at 104). "Only when the trial court's conclusions

are so 'clearly mistaken' or 'wide of the mark' should an appellate

court intervene and make its own findings to ensure that there is

not a denial of justice." E.P., supra, 196 N.J. at 104 (quoting

N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605

(2007)).

 12 A-3931-15T2
 EDGAR'S INABILITY TO CALL HIS EXPERT

 At the outset of trial, Edgar's counsel indicated she would

not be calling Dr. Reynolds as an expert, nor entering his report

into evidence. She intended to reference statements made by Dr.

Reynolds during his March 2015 evaluation that were included in

Dr. Hiscox's report. The judge found it improper to "get in [Dr.

Reynold's] opinions through [Dr. Hiscox's testimony]." The judge

also forbade eliciting information about Dr. Reynolds' evaluation

of Edgar during cross-examination when Dr. Reynolds testified on

behalf of Amy. Edgar's counsel then tried to offer the report

into evidence, but the judge precluded it, as trial had already

commenced.

 Edgar argues that his counsel's failure to call Dr. Reynolds

as an expert, ask Dr. Reynolds to update the report, or enter his

March 2015 report into evidence constituted either an abuse of the

judge's discretion or ineffective assistance of counsel under the

two-part test set forth in Strickland v. Washington, 466 U.S. 668,

104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); N.J. Div. of Youth &

Family Servs. v. B.R., 192 N.J. 301, 307-09 (2007).

 To establish an ineffective assistance of counsel claim,

 (1) counsel's performance must be objectively
 deficient--i.e., it must fall outside the
 broad range of professionally acceptable
 performance; and (2) counsel's deficient
 performance must prejudice the defense--i.e.,
 there must be a "reasonable probability that

 13 A-3931-15T2
 but for counsel's unprofessional errors, the
 result of the proceeding would have been
 different."

 [B.R., supra, 192 N.J. at 307 (citing
 Strickland, supra, 466 U.S. at 694, 104 S. Ct.
 at 2068, 80 L. Ed. 2d at 698).]

 This standard is "highly deferential," and "a court must

indulge a strong presumption that counsel's conduct falls within

the wide range of reasonable professional assistance." Ibid.

(citation omitted).

 The issue of ineffective assistance of counsel is properly

raised in the direct appeal of a termination of parental rights

case. Id. at 311. "[A]ppellate counsel must provide a detailed

exposition of how the trial lawyer fell short and a statement

regarding why the result would have been different had the lawyer's

performance not been deficient. That will include the requirement

of an evidentiary proffer in appropriate cases." Ibid. We may

resolve the question of ineffective assistance of counsel on the

appeal record alone, unless a genuine issue of fact is present,

in which case it must remand for an expedited hearing before the

trial court on the factual question. Ibid. Such a hearing is

appropriate here, given the importance of the expert's opinion.

 Alternatively, Edgar asserts it was error for the judge to

preclude Dr. Reynolds as his expert witness and exclude the report.

Edgar cites Mathews v. Eldridge, 424 U.S. 319, 334-35, 96 S. Ct.

 14 A-3931-15T2
893, 902-03, 47 L. Ed. 2d 18, 33 (1976) in support of his argument

that Edgar was denied due process. He argues "[t]his is not a

situation where the court and the other parties were blind-sided

by a call for an expert witness and the submission of an expert

report into evidence." Edgar asserts the emergent hearing held

on January 19, 2016, put everyone on notice of Edgar's intention

to use Dr. Reynolds as an expert. Moreover, "the report in

question was already presented and known to [the Division] and the

court from previous FN [abuse or neglect] litigation."

 Whether viewed as ineffective assistance of counsel or a

misapplication of discretion, we are convinced that Edgar and his

children were entitled to have the judge review Dr. Reynolds's

testimony and report. The Division had received a copy of the

report well before trial and Dr. Reynolds testified on behalf of

Amy. His reported findings with regard to Edgar were hopeful for

the most part, although not up-to-date. As we have said, the

children as well as the parent benefit from the court's review of

all available evidence potentially favorable to the parent. See

N.J. Div. of Child Prot. & Permanency v. K.S., 445 N.J. Super.

384, 392 (App. Div. 2016) (remanding the termination of parental

rights to allow the mother to testify, in spite of her non-

appearance in court until after the close of evidence). The judge

should allow Dr. Reynolds to update his report with regard to the

 15 A-3931-15T2
neurological findings, domestic violence occurrences and any other

development. The court should then hold a hearing, in an

abbreviated timeframe. The same judge who decided this case should

preside over the hearing and reconsider the decision to terminate

Edgar's parental rights in light of the additional evidence.

 DEFICENCIES IN THE COMPLAINT

 Amy asserts "this case is legally improper" because "[t]he

guardianship complaint filed in this matter did not allege a 'best

interests' cause of action under N.J.S.A. 30:4C-15(c)" and the

complaint "was not properly verified." Amy asserts Rule 1:6-6

requires verification based on personal knowledge, which is

lacking here as the caseworker swore only to the best of her

knowledge, information, and belief. R. 5:12-1(b); R. 4:67; R.

1:6-6.

 The complaint refers to "terminating parental rights . . .

pursuant to N.J.S.A. 30:4C-15 through N.J.S.A. 30:4C-20." It also

incorporates the initial abuse and neglect complaint and ensuing

orders. The Court in N.J. Div. of Youth & Family Servs. v. F.M.,

211 N.J. 420, 442 (2012) provided that "[t]o initiate a

guardianship petition with the goal of termination of parental

rights, at least one of the five grounds set forth in N.J.S.A.

30:4C-15(a) to (f) must be met." N.J.S.A. 30:4C-15(c) provides a

petition for guardianship may be filed when "it appears that the

 16 A-3931-15T2
best interests of any child under the care or custody of the

division require that he be placed under guardianship." An award

of "care or custody" of a child to the Division "is a stand-alone

basis for filing a guardianship complaint under N.J.S.A. 30:4C-

15(c)." F.M., supra, 211 N.J. at 443.

 Neither the issue of the substantive deficiencies in the

complaint nor improper verification was raised before the trial

judge and we decline to address the issues for the first time on

appeal. Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234-35

(1973).

 TERMINATION OF AMY'S PARENTAL RIGHTS

 Amy contends that the court erred in terminating her parental

rights, arguing the court's findings as to the four prongs of the

best-interests analysis were not supported by clear and convincing

evidence. Parents have a right "to raise a child and maintain a

relationship with that child[] without undue interference by the

state." E.P., supra, 196 N.J. at 102. That right is fundamental,

and protected under both the United States and New Jersey

Constitutions. Ibid. That right is not absolute, however, and

is "tempered by the State's parens patriae responsibility to

protect children whose vulnerable lives or psychological well-

being may have been harmed or may be seriously endangered by a

neglectful or abusive parent." F.M., supra, 211 N.J. at 447. As

 17 A-3931-15T2
termination of parental rights is considered an "extreme form of

action," E.P., supra, 196 N.J. at 102, and "a weapon of last resort

in the arsenal of state power," F.M., supra, 211 N.J. at 447, the

courts "have consistently imposed strict standards" in such cases.

In re Guardianship of K.H.O., 161 N.J. 337, 347 (1999).

 "The focus of a termination-of-parental-rights hearing is the

best interests of the child," and the Division must "satisfy by

clear and convincing evidence four factors, known as the best-

interests-of-the-child standard, set forth in N.J.S.A. 30:4C-

15.1(a)." F.M., supra, 211 N.J. at 448. Those four statutory

factors are:

 (1) The child's safety, health or development
 has been or will continue to be endangered by
 the parental relationship;

 (2) The parent is unwilling or unable to
 eliminate the harm facing the child or is
 unable or unwilling to provide a safe and
 stable home for the child and the delay of
 permanent placement will add to the harm.
 Such harm may include evidence that separating
 the child from his resource family parents
 would cause serious and enduring emotional or
 psychological harm to the child;

 (3) The division has made reasonable efforts
 to provide services to help the parent correct
 the circumstances which led to the child's
 placement outside the home and the court has
 considered alternatives to termination of
 parental rights; and

 (4) Termination of parental rights will not
 do more harm than good.

 18 A-3931-15T2
 [N.J.S.A. 30:4C-15.1(a).]

 The above requirements should not be considered separately,

but should form "a composite picture" of what is in the best

interests of the child. N.J. Div. of Youth & Family Servs. v.

M.M., 189 N.J. 261, 280 (2007). "[T]he cornerstone of the inquiry

is not whether the biological parents are fit but whether they can

cease causing their child harm." In re Guardianship of J.C., 129

N.J. 1, 10 (1992). Parents in such proceedings should not be

presumed unfit, and "all doubts must be resolved against

termination of parental rights." K.H.O., supra, 161 N.J. at 347.

 Because the trial judge must reconsider the termination of

Edgar's rights in light of Dr. Reynold's testimony, we review only

the termination of Amy's rights. Amy argues the court erred in

finding the Division proved any of the four prongs. She argues

the proofs as to prong one fail because her sons were taken away

from her only because of her treatment of Edgar's daughter Natalie.

 Under the first prong, the Division must demonstrate harm to

the child resulting from the parental relationship "that threatens

the child's health and will likely have continuing deleterious

effects on the child." Id. at 352. The Division must proffer

adequate evidence of "actual harm or imminent danger" to the child.

N.J. Div. of Youth & Family Servs. v. A.L., 213 N.J. 1, 30 (2013).

"Harm" in this context is not limited to physical harm, In re

 19 A-3931-15T2
Guardianship of R.G. & F., 155 N.J. Super. 186, 194 (App. Div.

1977); rather, it includes emotional and psychological harm, New

Jersey Division of Youth & Family Services. v. W.W., 103 N.J. 591,

605 (1986), a parent permitting his or her children to be exposed

to harm caused by another parent, New Jersey Division of Child

Protection and Permanency v. J.L.G., ___ N.J. Super. ___, ___

(App. Div. 2015) (slip op. at 10), aff'd o.b., ___ N.J. ___ (2017);

M.M., supra, 189 N.J. at 288-90, and a parent's inability to

provide a safe and stable home for the child, New Jersey Division

of Youth & Family Services. v. H.R., 431 N.J. Super. 212, 223

(App. Div. 2013), including the failure to provide day-to-day

nurturing and a safe and caring environment for a prolonged period

of time. N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J.

591, 604-07 (1986).

 The first prong may also be satisfied by expert evidence

demonstrating that a parent's untreated mental illness poses a

risk to the child, F.M., supra, 211 N.J. at 450-51, or that a

parent's mental illness prevents him or her from meeting a child's

daily needs. N.J. Div. of Youth & Family Servs. v. L.J.D., 428

N.J. Super. 451, 481-83 (App. Div. 2012).

 The judge's findings as to prong one were adequately supported

by the record. Amy's argument that her treatment of Natalie has

no bearing on Eric and Neil is without merit. The Division need

 20 A-3931-15T2
not wait until a child is harmed before intervening. F.M., supra,

211 N.J. at 449. Amy admitted on multiple occasions to taking

part in the physical abuse directed at Natalie.

 To satisfy the second prong, the Division must demonstrate

that 1) "the parent is 'unwilling or unable to eliminate the

harm'", or 2) "the parent has failed to provide a 'safe and stable

home for the child' and a 'delay in permanent placement' will

further harm the child." K.H.O., supra, 161 N.J. at 352 (quoting

N.J.S.A. 30:4C-15.1(a)(2)).

 The second prong compels an assessment of "parental

unfitness," based on "indications of parental dereliction and

irresponsibility." K.H.O., supra, 161 N.J. at 352-53. The court

should also consider any "[c]oncern and efforts by a natural parent

after his or her child has been removed from the home, and [the

parent's] genuine and successful efforts to overcome the cause of

the removal," as such efforts are "of enormous significance" in

the court's assessment of the second prong. N.J. Div. of Youth &

Family Servs. v. A.R., 405 N.J. Super. 418, 437 (App. Div. 2009).

 Amy argues the evidence showed that, by the time of trial,

she "had corrected the parenting skills deficits [the Division]

had identified as harmful to [Natalie] and potentially harmful to

[Eric and Neil]." Amy contends she should be allowed to complete

an additional six-months of therapy, as recommended by her expert,

 21 A-3931-15T2
Dr. Reynolds, "to see if additional services would held her achieve

stability."

 A child's best interests cannot be sacrificed because of a

parent's inability to address potential future harm despite his

or her willingness to try. See N.J. Div. of Youth & Family Servs.

v. C.S., 367 N.J. Super. 75, 111 (App. Div.), certif. denied, 180

N.J. 456 (2004). The focus is on whether the parent has

sufficiently overcome the initial harm that endangered the child's

health, safety, or welfare and is able to continue the parent-

child relationship without recurrent harm. J.C., supra, 129 N.J.

at 10.

 While Dr. Reynolds recommended additional services, he did

not state that those services would ameliorate Amy's parental

deficiencies. At the time of trial, all experts were in agreement

that Amy was then unable to parent safely. She had been engaged

in Division services for twenty months, from the beginning of

parenting classes until trial.

 The third prong of the analysis requires the Division to make

reasonable efforts to provide services to help the parent correct

the circumstances that led to the child's removal, and requires

the trial court to thoroughly explore alternatives to termination

of parental rights. A.G., supra, 344 N.J. Super. at 434.

 22 A-3931-15T2
 Amy asserts the Division did not make reasonable efforts, as

she was not provided with "psychotherapy to address low self-

esteem," or problem-solving issues as per Dr. Williams'

recommendation. Amy also argues that the judge erred in not

considering kinship legal guardianship (KLG). N.J.S.A. 30:4C-

15.1.

 Whether the Division provided reasonable efforts is not

measured by a defendant's success in his or her services. In re

Guardianship of D.M.H., 161 N.J. 365, 393 (1999). Withholding

permanency from a child with the hope that a parent will benefit

from services is not an option. "Children have their own rights,

including the right to a permanent, safe and stable placement."

C.S., supra, 367 N.J. Super. at 111.

 "[W]hen the permanency provided by adoption is available,

kinship legal guardianship cannot be used as a defense to

termination of parental rights." See N.J. Div. of Youth & Family

Servs. v. P.P., 180 N.J. 494, 513 (2004); see also N.J.S.A. 3B:12A-

6(d)(3) (instructing that a KLG is only proper when "adoption of

the child is neither feasible nor likely"); N.J. Div. of Youth &

Family Servs. v. T.I., 423 N.J. Super. 127, 137 (App. Div. 2011)

(recognizing that the potential availability of a KLG does "not

provide a basis for defeating the termination of parental rights").

 23 A-3931-15T2
 The Division provided Amy with therapeutic supervised visits,

evaluations, referrals for domestic violence counseling,

individual psychotherapy and parenting classes. Dr. Hiscox

testified at trial that no services, no matter how tailored to

Amy's intellectual limitations, would facilitate her ability to

parent independently in the foreseeable future. Permanency cannot

be withheld with the hope that a parent will comply and benefit

from services. See C.S., supra, 367 N.J. Super. at 111. The

third prong was supported by sufficient evidence in the record.

 Amy points to the positive bond that existed between her and

the children. Dr. Hiscox testified that the lack of a strong

attachment to a guardian may result in significant psychological

and relationship issues in children. Moreover, Dr. Hiscox

testified termination of parental rights would not do more harm

than good. The Law Guardian points out that the bonding evaluation

determined that while Eric may experience some minor disturbance

that would result from termination, it would not be lasting and

would not do more harm than good.

 "[A] child's need for permanency is an extremely important

consideration" under the fourth prong. R.G., supra, 217 N.J. at

559. "Ultimately, a child has a right to live in a stable nurturing

environment and to have the psychological security that his [or

her] most deeply formed attachments will not be shattered." F.M.,

 24 A-3931-15T2
supra, 211 N.J. at 453; see also D.M.H., supra, 161 N.J. at 385

(recognizing the "strong policy considerations that underscore the

need to secure permanency and stability for the child without

undue delay").

 The fourth prong "is a 'fail-safe' inquiry guarding against

an inappropriate or premature termination of parental rights."

F.M., supra, 211 N.J. at 453. It requires proof that "a child's

interest will best be served by completely terminating the child's

relationship with that parent." E.P., supra, 196 N.J. at 108.

Its "crux . . . is the child's need for a permanent and stable

home, along with a defined parent-child relationship." H.R.,

supra, 431 N.J. Super. at 226.

 A court is permitted to proceed with the termination of

parental rights when the parents are unfit to care for the child,

even in the event there is no bond with an alternative caregiver,

see New Jersey Division of Youth & Family Services v. B.G.S., 291

N.J. Super. 582, 593 (App. Div. 1996), because children should not

be allowed to "languish indefinitely" in a resource placement

while a defendant tries to correct the problems that led to the

Division's involvement with the family. N.J. Div. of Youth &

Family Servs. v. S.F., 392 N.J. Super. 201, 209-10 (App. Div.),

certif. denied, 192 N.J. 293 (2007). After trial, Eric and Neil

were placed with their grandmother, who wishes to adopt them. In

 25 A-3931-15T2
his April 2016 report, Dr. Hiscox concluded, "it is clearly in the

best interest[s]" of Eric and Neil to have Amy's "parental rights

terminated to them so they can be legally freed for adoption."

Dr. Hiscox found that termination of the parties' parental rights

"would do much more good than harm." We affirm the termination

of Amy's parental rights.

 Should the judge who tried the case, after conducting the

remand hearing, determine that the Division has not demonstrated

that Edgar's parental rights should be terminated, Amy may move

for reconsideration of the termination of her parental rights,

because it is not the policy of our State to terminate only one

parent's rights, leaving children with one rather than two parents.

"Two parents are better than one, even if one parent falls far

below the ideal." N.J. Div. of Youth & Family Sec'ys v. D.S.H.,

425 N.J. Super. 228, 242 (App. Div. 2012).

 We affirm as to Amy, A-3931-15. We reverse as to Edgar, A-

3933-15, and remand for forty-five days to allow Edgar's expert

to testify, the parties to inform the trial court of any

significant updates in the situation, and the judge to decide anew

whether the Division has proved its case. We retain jurisdiction.

 26 A-3931-15T2